UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Cardiovascular Systems, Inc.,  )  File No. 18CV1253
                               )        (SRN/KMM)
        Plaintiff,             )
                               )
 vs.                           )  Minneapolis, Minnesota
                               )  September 4, 2019
 Cardio Flow, Inc.,            )  3:45 P.M.
                               )
        Defendant.             )
                               )

------------------------------------------------------------

BEFORE THE HONORABLE MAGISTRATE JUDGE KATHERINE M. MENENDEZ
UNITED STATES DISTRICT COURT
**(MOTION HEARING)**

APPEARANCES
 For the Plaintiff:        Robins Kaplan Miller & Ciresi
                           ROMAN M. SILBERFELD, ESQ.
                           2049 Century Park East
                           Suite 3400
                           Los Angeles, CA 90067

 For the Defendant:        Anthony Ostlund Baer & Louwagie
                           DANIEL R. HALL, ESQ.
                           JOSEPH R. RICHIE, ESQ.
                           90 South Seventh Street
                           Suite 3600
                           Minneapolis, MN 55402

 Court Reporter:           KRISTINE MOUSSEAU, CRR-RPR
                           300 South Fourth Street
                           Box 1005
                           Minneapolis, MN 55415

    Proceedings recorded by mechanical stenography;
transcript produced by computer.

**3:45 P.M.**


**(In open court.)**

THE COURT:  Thank you.  Please be seated.  Sorry for the delay.  As you all saw our last criminal matter ran long, which happens sometimes.  Let's go ahead and get started.

All right.  We are on the record in Cardiovascular Systems versus Cardio Flow, 18CV1253.  Let's go ahead and get started with notice of appearance, first on behalf of the plaintiffs.

MR. SILBERFELD:  Good afternoon, Your Honor.  Roman Silberfeld for the Plaintiffs CSI.

THE COURT:  All right.  Welcome.  How are you?

MR. SILBERFELD:  Very well.  Thank you, Your Honor.

THE COURT:  All right.  And on behalf of the defendants?

MR. HALL:  Dan Hall, and with me today is Joe Richie on behalf of Cardio Flow, Inc.

THE COURT:  Welcome to both you.  Mr. Hall, are you going to be taking the lead?

MR. HALL:  Yes, Your Honor.

THE COURT:  Okay.  I would like to start with the motion to compel, and I'm just going to show all my cards,

and I'll leave it to your discretion on behalf of the plaintiffs, Mr. Silberfeld, whether to try to talk me out of it.  My instinct is to deny this motion as prematurely filed.  In its own text it describes itself as a placeholder.  It acknowledges that information is yet to come and that it's anticipating the possibility of future inadequate disclosures.

I require people to crystallize arenas of disagreement through meeting and conferring, and in the arena of disclosures, that involves specifically identifying here's what we asked for, here's what you provided, here's why we think it's inadequate, can we reach a compromise, what is yet to come, what areas remain unresolvable between us.

And I feel like given that this is a sort of a prophylactic motion to make a marker for later frustration that there is no basis in the record for me to grant it at this time.  Do you disagree with that approach?

MR. SILBERFELD:  I do, but the matter I think is largely moot in all events.  We filed this motion not as a placeholder, but because we had originally served requests for production of documents on the 26th of December 2018, and as of the time that we filed this motion in July, we had had very little by way of production.

However, after filing this motion, it seems to

have had some salutary effect on the plaintiff.  On the 22nd of August, we received about 11,000 pages of a production, and last Friday after hours of the holiday weekend, we received an additional 9,000 pages.

That 20,000-page cache of documents hasn't been analyzed by us yet.  It's with our document management people, and I don't know as I stand here today whether that's fully responsive to the three requests for productions of documents, but I think the motion has had an effect.

So I'm perfectly comfortable with either taking the motion off calendar as moot for now without prejudice to coming back and filing another motion if it turns out that this last 20,000 pages or so that we have just gotten doesn't actually hit the mark.  We will do that, of course, after we've had an opportunity to meet and confer with counsel.

But the motion also ties to another subject of importance for today, and that is, we have a discovery cutoff in 26 days.  As I mentioned, we got the vast majority of the production within the last two weeks.  We have noticed depositions in this case, and we chose dates, frankly, in the blind hoping to have a negotiation and a consultation with counsel for Cardio Flow about setting dates.

We began that process on August 2nd, and we have not confirmed a single date and have not received from them as far as I understand it any dates for any depositions that we have noticed.

THE COURT:  I don't see any mention of any of this in this motion.

MR. SILBERFELD:  That's correct.  That's not part of the motion to compel.  I was hoping we could talk about this in sort of a status conference fashion.

THE COURT:  Okay.  We will turn to that, but right now I want to keep our attention on the motion to compel.

MR. SILBERFELD:  I think the motion to compel can either go off calendar or be denied without prejudice.

THE COURT:  Okay.

MR. SILBERFELD:  That's fine with me.

THE COURT:  I appreciate the update, and I also appreciate understanding the recent flood of information that you have received.  I am going to deny that motion without prejudice to re-filing.  Let me just be clear to both sides.

When it is re-filed, it needs to be more specific, but that is because it will be.  You will know what you have received and have not received, rather than anticipating what you might not have received.  I have

meaningful expectations about meeting and conferring where I really expect counsel to try to work out disagreements. We've asked for this. We didn't get it. Well, you're right. You didn't get it, but I am willing to give you three of the six things you want. That's good enough. That's not good enough, and then bring those remaining three to me, but that's the extent of discourse that I hope for.

It helps us have a lot more efficient use of our time when we work together and when you brief to me. For now I will deny without prejudice, and when you have an opportunity to look at those productions for completeness, if there are remaining failures, we'll talk about that at the appropriate time.

MR. SILBERFELD: After we've had a chance to look at them?

THE COURT: Yes.

MR. SILBERFELD: Will do.

THE COURT: Let's pivot to the motion for protective order. I have done a lot of thinking about this motion. I have read the filings from both sides in detail. I have reread the complaint and my scheduling order to try to give myself an understanding of the kind of background.

It seems to me like one of the critical issues in this case is whether the plaintiff's assertion that the

settlement agreement between the parties not only carves up certain things as to patents and practices that existed at the time of the settlement agreement, but whether it binds future practices contemplated by future as of yet unfiled patents.

And I understand that that is sort of one of the critical disagreements between the parties is how to interpret the settlement agreement at all.

I think I want to start with Mr. Hall.  I've got some questions for you.

MR. HALL:  Sure.

THE COURT:  Okay.  Hang on one second.  Let me get this language in front of me.  So help me understand. It is your position that the settlement -- and this is a broader legal question that I'm not going to answer today. I just want to make sure I understand your position.

It is your position that to the extent that CSI's -- I'm sorry -- Cardio Flow's predecessor in interest -- help me pronounce her name.

MR. HALL:  Nadirashvili, N-a-v-i-r-a-s-h-v-i-l-i.

THE COURT:  To the extent Ms. Nadirashvili granted CSI an exclusive license to practice solid counterweights, is it your position that that was as to things that existed in the two portfolios of patents that were then being divided up?

MR. HALL:  It's close to our position.  So there is two patent portfolios.  There is the CSI patent portfolio, and our position regarding what Ms. Nadirashvili did with respect to the CSI patent portfolio is, she assigned to CSI any claim that she might have to ownership of the patents that were specifically identified in the CSI patent portfolio, and that's the patents that are called out on I believe it's Schedule 2 and in the written description of what the CSI patent portfolio is.

Once she assigned those, any claim that she had to those patents, she completed everything that she needed to do with regard to the CSI patent portfolio.  She no longer could, to the extent that she wanted to, claim ownership.  She assigned those to CSI.

With regard to the Nadirashvili patent portfolio, which is the set of patents that CSI assigned to Ms. Nadirashvili, she granted an exclusive license to CSI to practice claims covered by those patents in that patent portfolio that also were using solid counterweights and not some other technology, unless it was fully described in the CSI patent portfolio.

So there is an assignment for one patent portfolio, and then for the other patent portfolio, which is assigned to Ms. Nadirashvili, there is a license to specific or a specific category of technology using the

solid counterweights that is also covered by a patent claim within that portfolio.

THE COURT:  And your interpretation is that this agreement granted the exclusive license to CSI as to the patents in the Nadirashvili portfolio, but it was limited to the patents that existed at the time, and you disagree that that concession can be interpreted to grant a future exclusivity to practice solid counterweights?

MR. HALL:  Yes.  The license that she granted is only technology that falls within the existing Nadirashvili patent portfolio if it also happens to use solid counterweights.  The parties also described their abilities to prosecute patents within their own respective portfolios and other sort of issues that are tangential to what's going on here.

But the cross license from Ms. Nadirashvili can only be to the patents that she owned, which would be she is licensing patents she owns to CSI.  That provision has nothing to do with whether CSI, if it later files entirely distinct patents, comes within the ambit of the cross license because those are distinct patents, in this case distinct patents with distinct inventors filed after the time of the settlement agreement.

THE COURT:  So it's your position that later patents cannot, were not, implicated by the settlement

agreement?

MR. HALL:  I think that the -- I want to be clear on this because it's possible to have a patent that issues later that claims priority to an application that is described in the various patent portfolios, and so if a pending patent application issues as a later patent, that would be within the ambit of the specifically delineated portfolio.

But a new patent filed to start a new family after the settlement agreement is by definition not within either the CSI patent portfolio or the Nadirashvili patent portfolio and as a result is irrelevant to the analysis under the settlement agreement.

THE COURT:  And it's your position that neither patents that end in '124, '646 or '817, none can be described with that narrow exception that you just delineated of a later patent having priority to one of the identified patents?  None of those fall within that narrow exception?

MR. HALL:  That's correct, because the settlement agreement was entered into on August 27th, 2012.  In September of 2012, CSI filed a new patent application, which ultimately led to the issuance of those three patents, the '124, the '646 and the '817 patent.

It's a new application.  It's actually an

entirely distinct inventor. It's a CSI employee named Matthew Cambron. It's not Ms. Navirashvili's late husband Leonard Shturman whose patents were at issue in the settlement agreement.

THE COURT: So is it fair to say that it's your position that the extent which you do or don't infringe, and I know you'll say you don't, but the extent to which you do or don't infringe '124, '646 and '817 is utterly irrelevant to this litigation?

MR. HALL: That's correct.

THE COURT: When you were advocating before me for the exchange of claim charts, I will be candid that I expected those claim charts to address the patents in the settlement agreement.

Is that what you expected as well?

MR. HALL: That is what I expected, and I actually think that CSI's brief, page four of their brief, does a good job of setting forth the positions that each of the parties were taking at that point in time. CSI, as I understood it then, and what they said was that they didn't believe claim charts were necessary at all.

And Cardio Flow said to the extent that CSI alleges their breach of contract because Cardio Flow practices any claim of a licensed patent, CSI is asserting breach of contract by infringement, and that's why Cardio

Flow was seeking claim charts.

And we understood CSI had a broader, different reading of the contract than Cardio Flow had, but I believe the conversation was, our concern was, we get to summary judgment. It goes to the district court judge, Judge Nelson in this case, to decide is there any ambiguity there, and if not, what does the contract mean?

And if she accepted our position, we didn't then want to be at the far end having concluded discovery with CSI then attempting to pivot and say, well, even under that interpretation of the contract, there is some patent claim that we're going to pull out and say that you are practicing that patent claim covered by the settlement agreement and that you infringe.

I was surprised when we received claim charts that included one claim of one patent covered by the Nadirashvili -- I'm sorry -- covered by the CSI patent portfolio, no patents identified covered by the Nadirashvili patent portfolio, and three patents with different inventors that claimed priority to an application filed after the settlement agreement was entered into.

THE COURT: If I denied your request for a protective order and required you to provide the responsive document, what would you have to set forth as to the claims that were identified by CSI in its claim chart?

MR. HALL: So CSI provided an 86-page claim chart. I forget the exact number of patents that or patent claims that are identified, but if Cardio Flow were required to respond to each of the allegations in CSI's claim chart, we would have to go through and show for each claim element of those three patents what Cardio Flow's position is on whether its devices practice the elements of those claims.

And I understand from CSI's responsive brief that CSI argues that if you practice the claim of one of these three other patents, the '817, the '646 and the '124 patent, that you necessarily would --

THE COURT: Violate the settlement agreement.

MR. HALL: -- violate the settlement agreement because it would mean that you used solid counterweights. That's what I understand them to be saying in their brief.

Now, in preparing for this hearing, I went through the claim chart, and there is not any element of any claim of any of those three patents that even uses the word "counterweight" at all. So I went back, and I searched in the specifications for those three patents, did an electronic search trying to find the word "counter," and I couldn't find the word "counter" even appearing in the specifications of any of those three patents.

So it becomes a question then of, and this

becomes an exercise that ultimately would go to the judge, of determining, does something covered by those patents necessarily mean something about solid counterweights and then separately plotting the products that Cardio Flow is currently undergoing testing with against the claims of these three patents that CSI put in its claim charts.

THE COURT:  So what you're saying is that Cardio Flow would have to answer whether it practices countless claims that actually are not covered by the settlement agreement?

MR. HALL:  That's correct.

THE COURT:  And will you concede that any of the claims identified in the 86-page claim chart might deal with solid counterweights?

MR. HALL:  So I haven't closely examined whether they might deal with solid counterweights, but what I understand from CSI's briefing is if you practice one of those claims, what they are saying is you necessarily must practice solid counterweights.

And I would submit that that actually is an issue that is a separate issue that would require construction of these unrelated patents to determine whether what is claimed in those patents in fact necessarily requires solid counterweights.

And it's something -- there is nothing on this

record to make that determination because there is not an expert declaration.  There is not a declaration from some engineer that the claims used in those patents necessarily means solid counterweights.

I would just say the patents themselves don't talk about solid counterweights.

THE COURT:  Okay.  So you're not taking the absolute position that none of those claims implicate solid counterweights.  It's just your observation that they don't all obviously do so.

MR. HALL:  I just haven't done the analysis of whether or not every claim in the patents or the patent claims read in light of the specification, which is also sort of a requirement of construing what they read on, has any relation to counterweights.

They don't use the terms "counterweights" in the patents.  They don't use "solid counterweights" in any of the claim elements, and it puts CardioFlow in the position of being asked to respond to infringement allegations that CSI legally would not be able to bring right now because it is -- this is described in more detail in our brief.

But there is a statutory safe harbor whereby a patent infringement activity is statutorily not infringement when it is part of clinical trials, and the U. S. Supreme Court has applied that to medical devices,

and Cardio Flow believes it falls squarely within that safe harbor against infringement.

THE COURT:  So as a practical matter, if CSI is correct that Cardio Flow's -- if CSI is correct that Cardio Flow is violating its three patents, the three patents that are nowhere identified in the complaint, they cannot sue you right now because you haven't gone to market.

MR. HALL:  Correct.

THE COURT:  You're just in the approval stage.

MR. HALL:  That's correct.

THE COURT:  But the moment that you go to market, if they're right about the infringement, they could sue you for infringing their patent, and you would have to provide the information that they now seek then.

MR. HALL:  That's correct.  If at some point in the future they were to bring a lawsuit claiming patent infringement for those three patents, Cardio Flow would be required to respond, and one of the reasons why the safe harbor exists is because during the process of clinical trials, devices sometimes do not make it all the way through the trials.

Sometimes modifications are required for the devices in order to function properly, and so whether the product that ultimately gets all the way through the clinical trial process is the same as the current product

is an issue that could change as the clinical trials progress, and I frankly don't know exactly what the status of everything is there.

THE COURT:  What's the harm to you in answering this claim chart?

MR. HALL:  It is a couple issues.  One is that it is the burden of putting together a detailed legal analysis of positions that are essentially advisory when it comes to dealing with the issues in the court, in front of the Court.

The second issue is, it implicates something that the settlement agreement does not implicate, which is validity of these additional patents.  So the settlement agreement says that Ms. Nadirashvili and CSI can't challenge the validity of the patents set forth in the settlement agreement, but to the extent that CSI is now trying to assert different distinct patents and require Cardio Flow to respond to those, it would implicate whether those patents are also valid.

And so it would require an analysis of the validity of those three as yet unasserted CSI patents, and it would also require Cardio Flow to let CSI know these are all of our defenses to a claim that you can't currently assert.

CSI would then be able to evaluate the merits of

those defenses and whether they wanted to go try to seek other patents that actually would read on Cardio Flow's devices or seek other pending applications.

So it's a matter of the burden of doing the legal analysis and putting the response together, the additional implication of the validity issues for the three patents that are not properly before, are not properly part of the case, I guess the claim construction issues that would be required to be ultimately submitted to the Court concerning whether those patents necessarily or don't necessarily require the use of solid counterweights.

And then it would be tipping off CSI of essentially a free peek at Cardio Flow's non infringement defenses to these three issued patents, which would let CSI go back to the drawing board and say, you know, do we have some other patent or some other thing that we can try to get issued as a patent to try to read on Cardio Flow's devices.

THE COURT:  Well, right now aren't you all in the position of getting a free peek at their 86-page claim chart?

MR. HALL:  We did get a free peek at their claim chart, but I don't think that we asked for a copy of their claim chart.

THE COURT:  You asked for a copy of their claim

chart, but the question is whether you asked for a claim chart that contains three patents that are nowhere mentioned in the complaint.

MR. HALL:  That's correct.  We did not ask for a claim chart that contains three patents that are not mentioned in the complaint.  I should mention on that issue, CSI has prepared two versions of its claim chart.

It prepared a second version that it sent to Cardio Flow as in the sense of a notice of allegations of infringement of those patents, and so CSI has other purposes for telling Cardio Flow that CSI's position is, Cardio Flow practices those patents to provide a notice of infringement.

THE COURT:  So you're saying that the same work that went into the claim chart that was ordered by me -- whether it was ordered to cover these three patents is a separate question -- was also separately sent to you all as part of the notice from CSI that they believe that you are violating these patents, and that notice is separate from this litigation?

MR. HALL:  That's correct.  I think that they tried to provide it without reliance on the attorneys' eyes only documents from the case, and they directed it not as a litigation matter but as an infringement letter, essentially.

THE COURT:  So if it's your belief that if this case did not exist, that is their effort to put you on notice that they believe you're infringing.  They recognize perhaps that you're in the safe harbor, but they're laying the foundation for a future patent infringement lawsuit?

MR. HALL:  That's what I think they are doing.

THE COURT:  Okay.  What else do you want me to keep in mind?

MR. HALL:  Your Honor, I think we have hit on most of the issues that I think are reasonably raised by the briefing.  The last issue that I wanted to focus on a little bit is that CSI did make this allegation in its briefing that practicing the claims of any of these three patents necessarily requires practicing solid counterweights.

And I would just point out that in addition to the absence of any language in the patents using solid counterweights, there is an absence on the record before the Court of any actual evidence to support that assertion. All that we have here is attorney argument, no citations to any record evidence that would allow this Court to conclude on the record before it that practicing any claim of any of those three patents necessarily requires the use of solid counterweights, and so it's not an issue that I think is adequately teed up.

It's really the sole ground for relevance here, and if Cardio Flow were required to respond to these infringement allegations, I think it opens a variety of claim construction invalidity and other complicated issues that are not properly before the Court and that I don't think are raised by any parties' position concerning what the settlement agreement itself actually says.

THE COURT:  So let's roll this out to a future hypothetical.  Let's say that I agree with you and grant the protective order, and let's say that down the road the district judge interprets this settlement agreement in the way that CSI advocates, as carving up the future landscape between these parties for all time and giving CSI the exclusive right, not just as to the Nadirashvili patents, but as to all inventions to use solid counterweights, right?

I think that's CSI's position of the impact of the settlement agreement; is that right?

MR. HALL:  I think that CSI's position is that anything involving solid counterweights they get to do.

THE COURT:  Yes.

MR. HALL:  And Ms. Nadirashvili or any successor does not get to do.

THE COURT:  Yes.  Let's say they are right about that.  Let's say the district judge determines that they

are correct and that that is the significance of the settlement agreement.  They will say that they were deprived of the ability to prove that you violated that agreement by not being able to point to your responses to their claim chart.

MR. HALL:  And I don't think that that is the case, frankly.  So we've turned over the devices.  CSI has the devices.  They have the ability to analyze the devices and presumably at some point in this case, we will see an expert analysis from CSI's expert saying, this is all the ways in which your device practices solid counterweights.

And they also have Cardio Flow's engineering and design documents, and I anticipate they will have an expert who will say that whatever they have found in there leads to that same conclusion, that it's practicing solid counterweights.

And at that point, Cardio Flow is likely to have its own expert who will say these aspects of this invention, even if you adopt their view of the contract, would not lead you to the conclusion that Cardio Flow's devices involve solid counterweights.

And one of the claims of the claim infringement chart which we did respond to was that Claim 1 of the CSI patent, patent portfolio patent -- I believe it's the '923 patent, but I'm not -- the exact number is -- it is the

'923.

THE COURT:  Yes.

MR. HALL:  We explained why we don't have the thing that CSI identified as solid counterweights with respect to that claim is not a solid counterweight in Cardio Flow's device.  What I understand from the -- the way I see it playing out with these three patents is, CSI is essentially saying we want you to say, do you practice each element of each of the claims we have identified in these three patents?

If you -- if we determine that you do practice that or we have a conclusion about that, then we would need the district court judge to say and --

THE COURT:  That constitutes --

MR. HALL:  -- that element constitutes practicing --

THE COURT:  Solid counterweights.

MR. HALL:  -- a solid counterweight, which is redundant to the earlier dispute between the experts of, does Cardio Flow practice solid counterweights?  If the district court can resolve or the jury can resolve a dispute between experts about what a solid counterweight is, whether Cardio Flow is practicing solid counterweights without complicating the case by having three other patents at issue that don't say anything in their claims about the

use of solid counterweights.

THE COURT:  Okay.  That was very helpful.  I want to go back to one earlier question that I had for you before I ask you to sit down.  Do you read this language as limiting the -- okay.  I'm looking at Section 3A of the settlement agreement, and I realize I'm verging a bit into ultimate question territory, which I am trying not to do if I don't need to.

But when I read this section, I read that it gives a worldwide, royalty-free, paid-up, inevokable exclusive right and license to make, use, offer, sell and import devices using solid counterweights under the Nadirashvili patent portfolio.  So I read the extent of the license, the extent of the carving up, as limited to the Nadirashvili patent portfolio.

Is that how Cardio Flow -- I'm not concluding as a matter of law that that is the right reading.  Is it your position that under the Nadirashvili patent portfolio limits the extent of the worldwide royalty free paid-up right, or am I misunderstanding your argument?

MR. HALL:  No.  That's correct.

THE COURT:  Okay.

MR. HALL:  We believe that it has to have that other component.  It must be a patent right covered by or under the Nadirashvili patent portfolio to fall within the

ambit of that license.

THE COURT:  And things that would be defined as things under the Nadirashvili patent portfolio are the specific patents identified in the settlement agreement as falling under that title?

MR. HALL:  Correct.

THE COURT:  They're specifically delineated, and would that include their patent progeny to an extent or not?

MR. HALL:  I believe it does include the progeny of those particular patents.

THE COURT:  Okay.  But not the ideas at large?

MR. HALL:  Correct.

THE COURT:  Thank you for helping me understand that.

MR. HALL:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Silberfeld, I've got lots of questions for you as well.  So help me understand what advantage Cardio Flow gained from the disclosures you made in your claim chart.

MR. SILBERFELD:  They now have our very detailed, as the Court knows, description of the patent technology that ties both to the CSI portfolio in the settlement agreement and the Nadirashvili patent portfolio.

THE COURT:  Show me where in your complaint it

indicated that you were going to allege that these separate patents were covered by the settlement agreement and could be infringed.

I've read your complaint, and I see catch-all language about patents that Cardio Flow might be practicing that you didn't know about.  So you reserved the right to keep that open ended, but you didn't reserve the right to keep open ended invoking your own patents.

Help me see how this is related to the complaints.

MR. SILBERFELD:  The answer is found at page 10 of Cardio Flow's brief where they recite one of our discovery responses, and there are two aspects of this discovery response that are critical here.  The first sentence begins at the fifth line of that, from the top of page 10, Your Honor.

THE COURT:  Mm-hmm.

MR. SILBERFELD:  Where we say, U. S. Patents -- and I'm going to shorten the number -- '646, '817 and '124 each disclose and claim subject matter that is fully disclosed by the CSI patent portfolio.  That is the tieback from the settlement agreement and the CSI patent portfolio to these three patents and why we put them as we did into the claim chart.

And then the second part of this response that

bears on how we created the claim chart is the next sentence.  In addition to the extent that a device manufactured, sold -- pardon me -- manufactured, used, sold, offered for sale and/or imported according to patents '646, '817 and '124 practices solid counterweights, such a device, and the method to use that device, would require a license to one or more of the patent claims within the Nadirashvili patent portfolio, which was exclusively licensed to CSI under the settlement agreement.

That response is what ties together what we did in creating the claim chart in the way that we did.  Now, the Court will recall I was opposed to this.  I was opposed to this entire method.

THE COURT:  I do recall that, and I'm going to be really candid.  I did not expect your claim chart to include claims that aren't alleged in your complaint and identified as part of the two piles of patents that were at issue.

MR. SILBERFELD:  But they are.

THE COURT:  You're making them at issue in your claim chart.

MR. SILBERFELD:  No.  In the discovery response --

THE COURT:  When was this submitted?

MR. SILBERFELD:  The discovery response?  I don't

recall the date.

THE COURT:  Do you have any sense of that on behalf of Cardio Flow, Mr. Hall?

MR. SILBERFELD:  It is attached to your declaration.

MR. HALL:  The 17th of June 2019.

THE COURT:  Okay.  Go ahead, Mr. Silberfeld.

MR. SILBERFELD:  So as the Court will recall, I was opposed to the idea of doing claim charts, but once the Court ordered it, we sat down with skilled people who create these claim charts.  That's not me.

It's other people, and we created the claim chart in good faith and in complete disclosure of what we believe is implicated by the technology, broadly speaking, solid counterweights that was exchanged by these parties in connection with this settlement agreement.

For Cardio Flow then to come back and give us a sliver of a response and then make a motion for protective order to avoid giving us the rest of the information I think flies in the face of what this Court had in mind, which was to have claim charts that would be helpful.

THE COURT:  But if your notice to them and to me that you intended to provide -- I mean, they take the position that what you're really trying to do here is get a whole bunch of information outside the parameters of this

lawsuit that otherwise you wouldn't -- hear me out -- that otherwise you wouldn't be entitled to yet and that by expanding your claim chart and showing them things that you might be inclined to show them otherwise, in fact have arguably shown them otherwise, in order to trigger their obligation to respond, I don't see it in the complaint.

This isn't what I expected from your claim chart. Now, I recognize I have the least knowledge in this room of any of these things, and for notice, you point me to a discovery response that you submitted just over two weeks before this claim chart.

I don't think that really puts anybody on notice that you were going to both provide things related to patents outside of the complaint and expect reciprocal disclosures for these patents.

MR. SILBERFELD:  The issue that divides us, which has always divided us, is what is the extent of the technology that was exchanged between these parties?  Is it solid counterweights technology, period, or is it limited in some way?

That's an ambiguity that the district court is going to have to resolve.  We can't resolve it here.  We shouldn't resolve it here, but we have a point of view about this, and that point of view is expressed in the claim chart that we were ordered to provide and did provide

as it relates to solid counterweight technology.

And what I read to the Court is simply the tieback of these three patents, which seems to be the nub of the dispute between the parties here, the tieback of these three patents to the two patent portfolios that are undeniably the subject of the settlement agreement.

There is the CSI one and the Nadirashvili one, and both of those patent portfolios have solid counterweight technology as their basis to a certain degree, and there are rights that flow from it.  If we disclose and claim subject matter in later patents, which are the three patents we're talking about, then to the extent that any device practices that technology, a license would be required that is exclusively ours.

THE COURT:  How do you interpret the words "under the Nadirashvili patent portfolio"?

MR. SILBERFELD:  As descriptive only.  As descriptive only.  What we got in the settlement agreement was the right to practice solid counterweight technology. What Ms. Nadirashvili and subsequently Cardio Flow got was the right to practice nonsolid, or I will just say everything else, counterweight technology.  That's the bargain that was struck.

And these three patents and the claim charts associated with it is our best expression of what those

claims relate to.

THE COURT: Let me ask you this: Help me understand your position. Mr. Hall has highlighted that in your 86 pages of claim charts, it is unclear whether all of the claims at issue are necessarily related to solid counterweights, and clearly the extent of our conversation is limited to solid counterweights.

If they are infringing your patents in things even flagrantly that don't deal with solid counterweights, that's a patent infringement case. That's not this case.

How -- Mr. Hall says he has looked for an indication that those pages contain things that really do deal with solid counterweights. I agree with the premise that they shouldn't have to provide infringing defenses as to nonsolid counterweights in this litigation.

How do we know that all of these claims have to do with solid counterweights?

MR. SILBERFELD: Those were my instructions to the people that created the claim chart, and my best understanding is that those claims are limited to solid counterweight technology as it relates to whatever is contained in that claim chart.

The burden on this motion, though not a burden of responding to the claim chart, but the burden as the moving party here is really on them to explain how it doesn't

implicate solid counterweight technology.

THE COURT:  Not necessarily.  If I agree that the request that you're making for their response that is implicit in the suggestion that they have to respond to patents that I certainly didn't anticipate to be in this claim chart, but I recognize that's only limited relevance, you are seeking from them a response to something that I didn't anticipate when I ordered this claim chart.

If you are asking them to respond to allegations of claims that have nothing to do with this case, I think you also have a burden of establishing that those 86 pages of claims are coextensive with, coextensive with the issues in this case which are defined by solid counterweight.

So I don't squarely agree that because you chose to frame this in this way that the burden is entirely on them to prove something about your claims.

MR. SILBERFELD:  My only point is, just saying so doesn't make it so.  They're the moving party here, and so they had an obligation to come forward with a declaration from somebody that says that particular claim has nothing whatsoever to do with solid counterweight technology.

I did my job by having a ton of time and a ton of money, Your Honor, spent to create this claim chart in a very detailed, careful and thoughtful way responsive to solid counterweight technology as it relates to the

contract that we're here about.

So I have every confidence that between engineers and the patent lawyers who created this document -- as I said it wasn't me -- I have every confidence that our claim chart is precisely so limited, but if it's not, other than simply saying it's 86 pages, the burden was really upon Cardio Flow to come forward with something and say uh-huh, see there?  That has nothing to do with the issues in this case.

I don't believe they will find that.  I have a high degree of confidence that this is correct and limited in the way I've described.

THE COURT:  What value do you think -- so let's say that they have to respond to this claim chart in all respects, not just with respect to patent '923, which I think everybody agrees they have to respond to.

Let's say they respond to all of these their infringement defenses.  Does that bind them in any future way from raising different infringement defenses when the patents are actually at issue?

MR. SILBERFELD:  I don't know what the collateral estoppel or res judicata effect will be down the line.  I do know in the context of this case that we are bound by our claim chart statements, as they will be and should be, and let's just go back and remember what the goal of this

was.

The goal of this was to take technical matter and try to make it narrower by having the parties' positions stated clearly pretty much in a single document ultimately so that the Court could see and that the parties could see, and it would ultimately hopefully help in settlement, where everyone is with regard to these issues.

THE COURT:  Show me the first time or share with me the first time that you notified them that you were claiming that they infringed patents that were not one of these two portfolios or that their conduct implicated patents that were not one of the two portfolios in a way that violated the settlement agreement.

MR. SILBERFELD:  I think that has been our legal position from the beginning.  I can go back to transcripts for perhaps the very first time we were here where I said exactly that.

THE COURT:  Said what?

MR. SILBERFELD:  Said that what was transferred between these parties in this settlement agreement was the right to practice counterweight technology.

THE COURT:  Absolutely.

MR. SILBERFELD:  Broadly.

THE COURT:  Yes.

MR. SILBERFELD:  Yes.

THE COURT:  But in all candor, I did not understand that you meant that what they were violating were patents that post dated the settlement agreement.

MR. SILBERFELD:  Where the subject matter --

THE COURT:  Is solid counterweights.

MR. SILBERFELD:  -- is solid counterweight technology and a later patent like these disclose and claim that subject matter, that is squarely in our view within the ambit of what the Court ordered us to do, which was to create a claim chart, and we simply want a response to that.

And I think it's just fundamentally unfair to have argued for this as strenuously as they did.

THE COURT:  Yeah.

MR. SILBERFELD:  They prevailed.  We lost.  We did the work, and now we're here with them saying we shouldn't have to respond.  It's unfair.

THE COURT:  Tell me -- hang on just one second. My thought just escaped me.

Mr. Hall suggests that this claim chart was prepared for or provided in a separate function, which is putting them on notice of infringement of these three patents, and you know that I don't have the conversance in patents that you do, but sort of in the early steps of alerting them to the fact aside from the settlement

agreement of CSI's belief that Cardio Flow is infringing these three patents.

So they claim that you haven't really let the cat out of the bag in any particular way because you provided this list of infringements to them in that context. What's your answer to that argument?

MR. SILBERFELD: I'm aware of the fact that there were two times I think in the last year where CSI sent notice letters to Cardio Flow. I'm aware of that. Those events, as I best understand it, are disconnected from this claim chart and disconnected directly from this lawsuit. Those are separate business matters as between those companies.

I know how this claim chart was created. I was the architect of seeing that it was done to comply with this Court's order, and so I can't say, and I don't agree that the work in the claim chart was somehow done for a different purpose at all.

And I haven't sat down, by the way, to compare those letters and the 86 pages of claim charts to see whether they line up exactly. I haven't done that. I frankly don't think it matters.

THE COURT: Regardless, I mean if I'm evaluating competing prejudices, it could matter. So regardless of -- I'm not crediting the idea that it was not intended for

this case, but did you provide it -- presumably you've provided the claim chart to your clients and did so prior to every one of these communications.

Do you know that it has nothing to do with that, that they never used it?

MR. SILBERFELD:  I'm only pausing because of the attorneys' eyes only aspect of some of this.

THE COURT:  Sure.  Sure.  Sure.

MR. SILBERFELD:  Different people were involved in the creation of the claim chart than simply CSI people and CSI patent counsel, and so I can't, I can't explicitly say one way or the other what information was used for what purpose.  I can't do that.

THE COURT:  And is the claim chart attorneys' eyes only?

MR. SILBERFELD:  I don't recall.

MR. HALL:  It is.

THE COURT:  It is.  Okay.

MR. SILBERFELD:  I was just hesitating as to whether all of it was.

MR. HALL:  Just to clarify.  There was a separate, I believe a separate non attorneys' eyes only version that we also received roughly contemporaneous from Mr. Silberfeld.  That's my recollection.  I don't have that document.  It's not part of the record here.

THE COURT:  Okay.  Thank you.

Go ahead, Mr. Silberfeld.  What else would you like me to keep in mind?  Maybe you can answer the question that I posed to Mr. Hall as well.  Let's say that you are right in your reading of this contract and that it carves up the future landscape, not just the landscape as modified by the Nadirashvili patent portfolio, but future rights to practice solid counterweights or not.

MR. SILBERFELD:  Sure.

THE COURT:  Let's suppose that I deny or I grant the protective order and say that they don't have to answer the patents that aren't alleged in the complaint and part of the settlement agreement.

MR. SILBERFELD:  Yep.

THE COURT:  Mr. Hall alleges that in the position that you've taken throughout this case, the issue is not about the patents, but it is about whether the Freedom Flow device practices a solid counterweight.

MR. SILBERFELD:  Yep.

THE COURT:  And that you can answer that question using your experts and --

MR. SILBERFELD:  I can.

THE COURT:  -- then how would you be harmed by not getting this information in the context of this litigation?

MR. SILBERFELD:  Sure.  I'm entitled, I believe, to an admission from Cardio Flow as to whether or not their device reads on solid counterweight technology from whatever source, whether it's the CSI portfolio or the Nadirashvili portfolio or the three patents that followed it that are the subject of our claim chart.

We're entitled to ask and have asked in the form of this claim chart process that the Court ordered, we're entitled to know Cardio Flow's position on their device's solid counterweight technology.  I can cut up the device.  I surely can, and then we'll have a dispute as to whether I did it right or whether it's really solid.

I'm entitled to an answer from the defendant as to whether they practice solid counterweight technology in their Freedom Flow device.

THE COURT:  Have you asked them that question in request for admissions?

MR. SILBERFELD:  Well, in fact that's under consideration right now.  It is.

THE COURT:  So we don't know yet whether Cardio Flow takes the position that the device doesn't practice solid counterweights or whether they take the position that it does so but it doesn't matter because that doesn't violate the settlement agreement?

MR. SILBERFELD:  Right.  We don't have a single

deposition taken in the case yet because of the document production that I described earlier.

THE COURT: Mm-hmm.

MR. SILBERFELD: So obviously those will be questions that do get asked of the right people at the right time, and they will obviously be the subject of expert discovery, too, on both sides.

THE COURT: But you -- and you haven't yet made a request for admission on that very question. You're thinking about it.

MR. SILBERFELD: Yes.

THE COURT: Okay. What else do you want me to keep in mind, sir?

MR. SILBERFELD: Nothing ever so much on this motion, but I do really want to get back to --

THE COURT: I do, too, to the status conference.

MR. SILBERFELD: Yes.

THE COURT: Mr. Hall, anything else?

MR. HALL: I just wanted to clarify a time line issue. So we received CSI's claim chart itself I believe on May 10th. It was CSI's claim chart identifying those three patents that CSI had not previously provided that prompted Cardio Flow to serve a series of discovery requests directed to how those patents, whether those patents are covered by either the CSI patent portfolio or

the Nadirashvili patent portfolio.

We served requests for admission on that topic and then an interrogatory essentially asking to the extent that you're saying that they're covered by one of those patent portfolios, explain how they are, and that's where the response came in in discovery.

So it was not until after getting the claim charts that we got the discovery response from CSI on those various respective patents.

THE COURT: Prior to that, had you been notified in the context of your conversations with opposing counsel or pleadings that this claim chart would contain patents that are not divided up by the settlement agreement?

MR. HALL: We did not.

THE COURT: Did you expect it to?

MR. HALL: I was not expecting them to, and that was what prompted us about a week later to serve discovery directed at how are these patents implicated by either of these patent portfolios.

THE COURT: Okay.

MR. HALL: And the other thing I would point out is, the position that CSI is taking and the position that Mr. Silberfeld articulated in response to some of Your Honor's questioning about how these three patents are implicated by these patent portfolios was essentially that

if you practice a claim of one of those three patents, you would necessarily require a license to the Nadirashvili patent portfolio.

And that's a striking position because CSI itself is asserting that Cardio Flow practices those other three patents without identifying anything in its claim chart indicating that those patents also or those products also practice any claim of the Nadirashvili patent portfolio.

If CSI were taking the position that Cardio Flow's devices practice claims of, say, the '646 patent and that necessarily means that they practice claims of the Nadirashvili patent portfolio, we would have expected to get claim charts covering that issue, the practicing of those claims under the Nadirashvili portfolio, which we didn't get.

THE COURT:  And those claims are claims to which Mr. Silberfeld alleges CSI has an exclusive license.

MR. HALL:  Yeah.  The Nadirashvili patent portfolio are the patents implicated by the settlement agreement and that specific Section 3A that we were talking about earlier.

THE COURT:  So what you're saying is that according to the position Mr. Silberfeld just took, if it is correct about how the settlement agreement carved up the future that in order for these three patents to be

relevant, there also would have to be allegations of claims from the Nadirashvili patent portfolio.

MR. HALL:  That's correct.

THE COURT:  Okay.  Thank you.

Let's talk about next steps.  We are nearing the end of discovery.  It feels like from what Mr. Silberfeld is sharing that he has concerns about whether we're going to be able to make it.

He has raised concerns not only about the relative untimeliness of Cardio Flow's production of 20 plus thousand documents in the two months before the end of discovery, but about not getting answers to requests for depositions.

So tell me what you are proposing, and then I want to hear from opposing counsel.

MR. SILBERFELD:  My colleague and Mr. Hall had a chance to talk about this I think briefly, and the suggestion by Cardio Flow of a two-week extension simply will not work.  Our view of it is that we have had not a single deposition.

We have not reviewed two-thirds of the documents that have been produced because they just came in the last ten days or so.  We have a discovery deadline of September 30 and an expert report and designation deadline of September 30 also.

Our view of it is that those dates have to get moved out at least 90 to 150 days with obviously an effect on the April 13th trial date, too, because 90 days puts us smack dab into the holidays at the end of December, and, you know, if history is any guide, it took a long time to get a device.

We noticed depositions on August 2nd.  It's now September 4th, and we don't have a single date for depositions, and as I say, if history is any guide, it's going to be a while before we get the work in this case done.

It's just fundamentally too close now, 26 days to the discovery deadline, to get any of this work accomplished, and so our view of it is that at least 90 days but probably more like 120 to 150 days, given the holidays coming up later this year, is what is required to get the work done that needs to be done in this case.

And the only other thing I would add is, I would actually like to see us stagger fact discovery from expert discovery, and I'm kicking myself that I didn't ask that at the time that we set the schedule.  Maybe I did.  I just don't remember, but I think it makes sense in a case as technically complicated as this to stagger the end of fact discovery and the end of -- pardon me -- the expert designation by approximately 30 days.

THE COURT:  I think that consolidation may have been at my suggestion.  I don't remember for certain, but when I see a longer schedule, that's a place where sometimes we try to achieve a little bit of consolidation. So among other things, you're saying you want all numbers moved back 90 to 120 or 150.

You also want to have a built in 30 days between close of fact discovery and the initial disclosure of the expert report?

MR. SILBERFELD:  Yes.

THE COURT:  Okay.

MR. SILBERFELD:  I think that makes sense for both sides.

THE COURT:  Okay.  Mr. Hall.

MR. HALL:  I actually spoke with Mr. Allender, who is not here, on August 22nd.  I thought that we had a productive phone call, and I was expecting last week to see a draft stipulation moving around some of the dates.  We had talked about a shorter extension of time.

We were going to try to limit it to just fact discovery and expert deadlines without touching some of the others, but I have no problem attempting to work out an extension of the schedule of some sort with Mr. Silberfeld or with Mr. Allender.

I would suggest that as a precursor and maybe a

report back to you by some particular point in time.

THE COURT:  I always find it better if you all, knowing the intricacies of what you need, can agree on something.

I am concerned about the lateness of your document disclosures.  I mean last Friday is August 30th.  That's a month before the close of fact discovery.  That's 9,000 pages, and the 11,000 pages is one week before that.  Help me understand why that made sense.

MR. HALL:  I would say that the parties in this case both share a similar issue.  We're actually still waiting for CSI's first production of documents that was not entirely consisting of public records and documents that had already been exchanged between the parties here.

For example, we have not yet received from CSI any of the correspondence exchanged concerning the actual drafting of the settlement agreement, execution of the settlement agreement with, between CSI and Ms. Nadirashvili.  We haven't received any of CSI's own internal records or anything that was not publicly available.

So I'm a little surprised, frankly, that CSI is the one that is bringing motions here and saying we're bumping up against deadlines and it's all your fault, Cardio Flow, because I think the parties jointly have not

provided all of the discovery as quickly as perhaps we anticipated when we set the schedule.

I am still waiting for CSI's next document production and part of the reason for not --

THE COURT:  My question to you wasn't about what you think they haven't done.  It's about how you defend producing 22,000 pages six weeks before the end of discovery.

What happened that made that delay?

MR. HALL:  We have been trying to gather documents and review the e-mails of the various different e-mail accounts of Cardio Flow custodians, get through all of the documents responsive to a series of broad discovery requests.

We just received another set of discovery requests last week, and we have been trying to get through it as quickly as we possibly can.

I think the attorneys in this case have each on both sides had delays occasioned by lengthy trials that took place in the middle of time periods that we might otherwise have been able to get things out more quickly, but that's sort of the general reason there.

THE COURT:  And that makes sense.  So I strongly share your preference for you guys working together to figure out what makes sense in terms of additional time.  I

share Mr. Silberfeld's initial impression that two weeks probably isn't going to cut it at this point.  It sounds like you are not advocating for that and that you had a productive conversation with other opposing counsel.

I would really prefer that you all try to agree on whatever comes next and provide a stipulation to the Court.  I will have to address it with Judge Nelson because definitely you will be moving what I call her dates, as well as my dates.

My dates are discovery things, non dispositive motions related to discovery.  I can move those freely, and I would do so readily in this case.  Her dates include the dispositive motion deadlines and the trial date, and I need to get her agreement that moving those is appropriate.

In a case like this where there has been a lot going on and it's clear you're working hard, even if not all information has been provided across the table immediately, I do expect that she would agree with that adjustment, but I'm just letting you know in your stipulation, agree on as much as you can and provide some explanation for why.

And then I will consult with Judge Nelson and sign it as quickly as I can, if she is in agreement.

MR. HALL:  Thank you, Your Honor.

THE COURT:  Does that make sense, Mr. Silberfeld?

Does that make sense to you as well?

MR. SILBERFELD:  It does.  We're all here.  I would really like to hear a proposal, and I just might say yes.

THE COURT:  What do you think?

MR. HALL:  In terms of --

MR. SILBERFELD:  I've made a proposal.

MR. HALL:  In terms of moving discovery, I would like the opportunity to confer with my client about timing for an extension if we're talking about especially the length Mr. Silberfeld is proposing.

A two-week extension, three-week extension, something that is relatively short, I feel like I can agree to as a matter of professional courtesy without having that discussion.  I understood his proposal to be in the neighborhood of 120 days.

THE COURT:  Three to five months.

MR. HALL:  And I feel like I need to have a conversation with my client.

MR. SILBERFELD:  I think that's fine.

With that in mind, can we have a deadline?

THE COURT:  That's a great idea.

MR. SILBERFELD:  A week from today or something close to that where we either come back to the Court with a stipulation extending times or a joint statement, their

position, our position.  The Court will decide.

THE COURT:  Perfect.

MR. SILBERFELD:  Is that appropriate?

THE COURT:  Does a week from today work for you, Mr. Hall?

MR. HALL:  Yes, it does.

THE COURT:  I would note that you can file a stipulation as to what you agree on that includes a note about a disagreement or separate statement.  If you can agree on most things and have one or two things in disagreement, that's fine as well.  I can resolve those for you.

I can certainly do this from the outside.  I find that you all are in a much better position to figure out what needs to be done than I do.

I see Mr. Silberfeld packed his stuff to go.  Do we need to discuss anything else, Mr. Hall?

MR. HALL:  I don't think so, Your Honor.

THE COURT:  Mr. Silberfeld, anything else for you?

MR. SILBERFELD:  I don't think so.

THE COURT:  I think we are in recess then.  Thank you very much.

**(Court was adjourned.)**

*          *          *

I, Kristine Mousseau, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by:  s/  Kristine Mousseau, CRR-RPR
                   Kristine Mousseau, CRR-RPR